## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| NATHAN SCAFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3: 21-cv-00815 |
| | ) | Judge Aleta A. Trauger |
| THE GAP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant The Gap, Inc. ("Gap") (Doc. No. 26), seeking judgment in its favor on the plaintiff's claims under the Family and Medical Leave Act ("FMLA"), Americans With Disabilities Act ("ADA"), and Tennessee Disability Act ("TDA"). For the reasons that follow, the motion will be granted in part and denied in part.

## I.    FACTS AND PROCEDURAL BACKGROUND[1]

Gap operates a warehouse and distribution center in Gallatin, Tennessee. Plaintiff Nathan Scaff was employed by Gap at its Gallatin facility from 2018 until his termination on or about September 24, 2020. (*See* Doc. No. 29-10, Termination Form; Doc. No. 34-3, Williams-Whitfield Dep. 91.[2])

---

[1] The facts for which no citation is provided are undisputed, at least for purposes of the defendant's Motion for Summary Judgment, and are drawn directly from the plaintiff's Response to the defendant's Statement of Undisputed Material Facts ("SUMF") (Doc. No. 33) or the defendant's Response to the plaintiff's Additional Statement of Facts ("ASF") (Doc. No. 39).

[2] The court notes its appreciation of the plaintiff's filing of complete copies of deposition transcripts, rather than multiple excerpts. The transcripts provided by the plaintiff are in condensed form, and the court employs herein the actual deposition pagination rather than the page numbers assigned by CM/ECF.

## A.    Gap's Attendance and FMLA Leave Policies

Gap has a written Attendance Policy that defines "Emergency Days" as "unplanned or unexcused absences, late arrivals or early departures." (Doc. No. 28-7, at 2.) Any Emergency Day qualifies as an "occurrence." (*Id.*) Pursuant to the Attendance Policy, an employee who accrues more than twelve and one-half "occurrences" per calendar year "may" be subject to a "corrective action up to and including termination of employment." (*Id.* at 3.) Generally, an employee will receive a verbal warning after the thirteenth occurrence, written and "final" written warnings after the fourteenth and fifteenth, and termination after the sixteenth occurrence. (*Id.*) Although each employee's occurrence count starts over at the beginning of each calendar year, any corrective action remains active for twelve months from the date of issue and may result in escalation of the progression of a subsequent corrective action occurring during that twelve-month period. (*Id.*) The Attendance Policy specifically excludes from absences that would otherwise qualify as occurrences any "absences covered by FMLA, Workers Compensation or other applicable law." (*Id.* at 2.) "Employees are ultimately responsible for keeping track of their occurrences." (*Id.* at 3.) Employees are responsible for providing notice of any unplanned or unexcused absence by calling the "Attendance Hotline" or their supervisor. (*Id.*)[3]

The plaintiff testified that he was aware of the Attendance Policy and that, to his knowledge, all Gap employees were subject to it. (Doc. No. 34-1, Scaff Dep. 128.) When he needed to call out of work for a health reason, he would call the "shift manager" and leave a message. (*Id.* at 89.) He was aware that employees who accrue sixteen occurrences are subject to termination. (*Id.* at 130.)

---

[3] Different rules apply to "no call no show" occurrences and unexcused absences of which the employee provides notice. (*See* Doc. No. 28-7, at 3.)

Angela Lash, Human Resources Generalist for Gap, characterized Gap's Attendance Policy as a "no-fault" policy. (Doc. No 34-2, Lash Dep. 17.) While Lash's testimony indicates that the Policy is generally enforced, she acknowledged that individual department managers have the discretion on occasion to retroactively excuse unexcused absences, depending on the circumstances. (*See id.* at 19–20 ("It . . . could vary. But that [decision to excuse] would ultimately be up to usually the manager of the department. He might allow – like, depending on the circumstances, let's say it was a . . . nonimmediate family member's death, which wouldn't necessarily be covered under the bereavement policy, but it still might be something they would look at and possibly excuse.").)

Wilshanda Williams-Whitfield, Senior Human Resources Generalist, similarly testified that the no-fault policy may be subject to exceptions and that, when an employee has reached sixteen occasions and is subject to termination, she will generally have a conversation with the employee to discuss whether "there was any lingering condition that may have caused them to miss multiple days. And we'll review to determine if we're going to give credit for any of those days." (Doc. No. 34-3, Williams-Whitfield Dep. 28–29.) According to Williams-Whitfield, 346 Gap employees were discharged from Gap's Gallatin, Tennessee facility in 2020 for exceeding the maximum number of unexcused absences. (Doc. No. 28-8, Williams-Whitfield Decl. ¶ 5.)

Gap also maintains an FLMA policy, which provides that employees may take up to twelve weeks of unpaid leave for medical reasons, either consecutively or intermittently. (Doc. No. 28-3, FMLA Policy.) Gap utilizes Aetna as a third-party administrator to administer employee leave under the FMLA.[4] The FMLA Policy requires employees to notify their manager and the third-

---

[4] Aetna was succeeded by the Hartford as Gap's third-party administrator. For simplicity, the court refers herein to the third-party administrator as Aetna or "third-party administrator."

party administrator of their need for FMLA leave, "by either requesting FMLA leave specifically or explaining the reasons for leave so as to allow the Company to determine that the leave is FMLA-qualifying." (Doc. No. 28-3, at 4.) For intermittent leave, employees "must report [their] intermittent FMLA . . . leave to [their] manager and [the administrator] within 2 business days from [the] first date of absence." (*Id.* at 3.) The third-party administrator determines whether to approve or deny requested leave under the FMLA. Absences approved for FMLA leave do not count as "occurrences" for purposes of the Attendance Policy.

Gap does not have a written ADA policy.

### B. Scaff's February 2020 FMLA Leave

Scaff was initially employed by Gap as a Merchandise Handler or "picker," assigned to work in what the parties refer to as the "CEO" building on Gap's Gallatin campus, picking items to fulfill online orders. In December 2019, he received a Corrective Action for accruing 13 occurrences in 2019.

Between January 1, 2020 and February 14, 2020, Scaff accrued ten occurrences. On February 20, 2020, Scaff was hospitalized with ketoacidosis and diagnosed with Type II diabetes. Prior to his hospitalization, the plaintiff had not been aware that he had diabetes. He remained out of work until March 10, 2020. The parties do not indicate that the plaintiff requested or received FMLA leave for the entire duration of his hospitalization, but they seem to agree that his absences during his hospitalization were excused.[5]

---

[5] The plaintiff testified, and the defendant seems to believe, that his request for leave from February 20 through March 9, 2020 was approved. (*See* Scaff Dep. 102–03.) His Attendance Tally actually reflects that he accrued one unexcused absence or "occurrence" on February 24, 2020, while he was still hospitalized. (*See* Doc. No. 28-10.) But again, this absence seems not to have been counted against him as an unexcused absence.

The plaintiff understood that FMLA leave requests were reviewed and decided by the third-party administrator. On March 4, 2020, the third-party administrator notified Scaff that his March 4, 2020 request for intermittent FMLA leave had been received and was being processed. (Doc. No. 29-1, at 2.) The notice instructed him to read the "packet" enclosed with the letter "carefully," as he would need to take additional steps before his request for leave would be approved. (*Id.*) Specifically, enclosed with the letter was a form Leave of Absence Certification to be completed by the plaintiff's medical provider and returned to the administrator. Additional information informing the plaintiff of his rights and responsibilities under the FMLA was also enclosed. (*Id.* at 5.) The plaintiff testified that he received this letter and that, although he did not read all of the materials enclosed with it, he was aware of his FMLA rights and responsibilities. (Scaff Dep. 87–88.)

The plaintiff's medical provider, Jenna Gunselman, PAC, returned the signed and completed FMLA Certification on March 17, 2020. (Doc. No. 29-3.) She stated that the patient had recently been hospitalized with elevated blood sugar and diabetic ketoacidosis and had been incapacitated from February 20 through March 9, 2020 but could return to work March 10, 2020. Gunselman estimated that Scaff would need to be off work periodically due to flare-ups of his condition, but her indication of the frequency of such flare-ups is ambiguous, stating that flare-ups could be expected to occur once every three months *and* once every one to two weeks. (*Id.* at 4.) She estimated the duration of such episodes to be two days. (*Id.*) She also noted that Scaff would need follow-up medical appointments once a month for three months and then at least once every three months. (*Id.* at 4, 5.)

On March 26, 2020, Scaff was notified that his request for intermittent leave from March 4, 2020 through March 3, 2021 was approved. (Doc. No. 29-2.) Aetna interpreted Gunselman's

ambiguous certification to mean that Scaff would need intermittent leave approximately once every three months for a period of up to two weeks at a time for flare-ups of his condition and once a month for two hours at a time for medical appointments. (Doc. No. 29-2, at 2.) The approval notice expressly directed Scaff to let his manager and the administrator know each time he needed to take time off and that, if he failed to do so within two days from the first date of absence, his request might be denied. (*Id.*) Additionally, he was informed that, if he needed leave time outside the parameters outlined in the letter, he would need to let the administrator know "why [he] need[s] the extra time." (*Id.*)

### C.      The Plaintiff's Return to Work

The court takes judicial notice that, shortly after the plaintiff returned to work in mid-March, the COVID-19 pandemic began disrupting every aspect of life and commercial activity in the United States (and worldwide). Apparently in connection with the plaintiff's concern that his diabetes and still poorly controlled blood sugar put him at high risk if he contracted COVID, the plaintiff made a verbal request to the administrator for medical and/or FMLA leave (not intermittent leave directly in connection with his diabetes, which had already been approved). (*See* Scaff Dep. 114–15.) Aetna notified him on April 13, 2020 that his request for leave from April 7, 2020 through April 29, 2020 was denied on the basis that "the reason for the leave isn't covered" under the FMLA. (Doc. No. 29-4, at 2–3.) On April 18, 2020, the plaintiff submitted a request to Aetna for an accommodation under the ADA. (*See* Doc. No. 29-5.) Aetna's notice of receipt of this request directed Scaff to have his physician complete and return the Accommodation Request form enclosed with the notice. (*Id.* at 3.) On May 13, 2020, Aetna notified Scaff that his request for an ADA accommodation was "closed" based on his failure to submit the information needed for the claim to be reviewed. (Doc. No. 29-6, at 2.) The denial letter further stated: "If we get the information we need, we may be able to re-open your request." (*Id.*)

Aetna notified Gap that the plaintiff had requested an accommodation under the ADA. (*See* Doc. No. 34-12.) The notice to Gap stated: "We told [Scaff] that we need an Accommodation Request form completed by him and his physician [by] May 4, 2020. Once we have a completed Accommodation Request form, we'll forward it on to you." (*Id.*) Williams-Whitfield testified that she did not see this notice until after Scaff's termination but that it would have gone to Scaff's supervisor and an HR coordinator. (Williams-Whitfield Dep. 72–73.) The record reflects, however, that Williams-Whitfield was notified in April 2020 that the plaintiff claimed to be at high risk for COVID-19 due to a medical condition and had submitted to Aetna a request for leave under the ADA as an accommodation for a disability, but that he had not yet returned the Accommodation Request form from his medical provider. (*See* Doc. No. 34-12.) As set forth above, the plaintiff never returned the Accommodation Request form, so his request for ADA leave was neither formally denied nor granted. Instead, it was simply "closed." (Doc. No. 29-6.) Williams-Whitfield was also notified that Scaff had submitted a second request for FMLA leave and that the request was denied. (*See* Doc. No. 34-13.).

However, in response to the pandemic, Gap relaxed its Attendance Policy for a period of time. (Williams-Whitfield Dep. 28.) In essence, Gap adopted an "open-leave" policy in April 2020, pursuant to which employees were permitted to miss work for any reason or no reason at all, without accruing occurrences for those absences. (*Id.* at 44–45; Lash Dep. 32–33.) Under this policy, Scaff was absent from work from early April to mid-June 2020. (Scaff Dep. 116–17.) He went back to work on June 15, 2020, after he was "able to get clearance" from his medical provider. (*Id.* at 116.)[6]

---

[6] The plaintiff points to Williams-Whitfield's testimony that the lenient COVID attendance policy might have lasted through August. (Doc. No. 33, Pl.'s ASF ¶ 6.) Williams-Whitfield actually testified that she "believed" the company went back to the regular Attendance Policy in

Prior to his hospitalization in February, Scaff had requested to be transferred from the "picking" department to the shipping department, housed in a building the parties refer to as the SDC building. This request was granted while he was on leave. When he returned to work in March 2020, and again in June 2020, it was in the SDC building as a Shipping Associate.

Because of his diabetes, the plaintiff was required to check his blood sugar level before each meal. Within his first week back at work, Scaff asked his supervisor at the time for permission to take his lunch break five minutes early, so he could get to the bathroom off the break room, check his blood sugar and, if necessary, inject himself with insulin in privacy. (Scaff Dep. 106–07.) His supervisor approved this request without requiring him to submit any paperwork or a doctor's note in support of it. (*Id.* at 108.)

Several weeks after he returned to work after his COVID-related leave, in early to mid-July, Scaff was allegedly told by Jeff Tait, Operations Supervisor, that he would not longer be allowed to leave early for breaks to check his blood sugar, because the new manager, Paul Connor, thought Scaff was "cheating on [his] breaks." (*Id.* at 109.) According to Scaff, Tait told him the restriction would not apply if Connor was out.[7] (*Id.*) Scaff never talked to Connor about why he needed to start his break early, and he never complained to HR or anyone else at Gap about no longer being permitted to start his break early so that he could check his blood sugar in private. (*Id.* at 109–10.) He testified that he was "still able to check [his] blood sugar," but it "cut into [his] break," and he was not able to do it in private, because by the time he got to the bathroom, it would

---

August 2020, but she could not "guarantee" that it was August. (Williams-Whitfield Dep. 64.) Later in her deposition, she corrected herself, stating that it had ended earlier, because Scaff and other employees were being assessed occurrences earlier than that. (*Id.* 103–04.)

[7] Tait testified, to the contrary, that he always allowed Scaff to take longer breaks to check his blood sugar and that Scaff was never penalized for doing so while under Tait's supervision. (Doc. No. 34-4, Tait Dep. 14, 24.)

be crowded with his co-workers.[8] (*Id.* at 112, 113.) The plaintiff believes that Connor was not "informed properly" about his diabetes and that, if he had been, Connor "wouldn't have made those certain decisions. He would have asked for more clarification." (*Id.* at 145.)

After the plaintiff returned to work in June 2020, he never notified the third-party administrator of a request for additional FMLA leave, and he never notified Gap that he was taking intermittent leave based on the previous authorization. (*Id.* at 119.) His Attendance Tally shows that he took two Full Emergency Days and three Half Emergency Days from June 22, 2020 through August 31, 2020, thus accruing three and one-half additional occurrences during that time frame. (Doc. No. 28-10.) The plaintiff does not contend that these days should be excused as falling under the FMLA.

### D. The Plaintiff's Termination

On his return to work in June 2020, the plaintiff was still working in the shipping department, in the SDC building. (*Id.* at 119.) Beginning in September, Gap shifted some of its workforce from the SDC building to the CEO building, due to its increased online sales and slower volume in the SDC. In September 2020, all of the Shipping Associates in the SDC Building were assigned to work overtime shifts in the CEO Building on rotating weekends. Around this time, Scaff was asked to report to the CEO building for some weekend shifts. (*Id.* at 122.) He testified that he told Jeff Tait that the "only reason" he was allowed to work was because he was able to practice social distancing in the SDC building and that his "blood sugar was still fluctuating." (*Id.* at 122.) He was afraid he would not be able to socially distance in the CEO building. (*See id.* at

---

[8] The plaintiff now states, in his ASF, that there was a private bathroom in the SDC building that he could have used to "accommodate" his need for privacy. (Pl.'s ASF ¶ 32 (citing Williams-Whitfield Dep. 43).) The plaintiff, however, apparently never requested the use of a different bathroom or other private location.

127 ("[B]efore I had been diagnosed with diabetes, I have worked during a peak season. And you have over 70 employees in a very small area. Well over.").)[9] Tait purportedly told him, "[D]on't worry. You don't have to show up at all." (*Id.*) Scaff told Tait that he could work overtime in any other building where he could practice social distancing, but Tait assured him, "It's okay." (*Id.*)[10] It is undisputed that Scaff was nonetheless scheduled for two weekend shifts in the CEO building, that he did not show up for those shifts, and that he accrued two additional occurrences as a result. (*See* Doc. No. 28-10.) These occurrences were in addition to the three and one-half unexcused occurrences he had accumulated from June through August and the ten he had from before his hospitalization, for a total of fifteen and one-half occurrences.

According to the plaintiff, he was directed to report to HR one day in late September 2020. His Termination Form indicates that this day was probably September 24, 2020. (Doc. No. 29-10; *see also* Williams-Whitfield Dep. 91.) He sat down with Williams-Whitfield, and she asked about his accumulation of "points." (Scaff Dep. 132.) He told her he had "FMLA paperwork." (*Id.*) She asked if he had it on him; he replied that he did not carry it around with him, but it was "in the system." (*Id.*) Williams-Whitfield asked him if any of his accrued occurrences would have been covered by his approved FMLA intermittent leave. Scaff said he did not know, because he did not remember the exact days he was out. Williams-Whitfield asked specifically why he had not reported on the weekends when he was supposed to work overtime in the CEO building, and he

---

[9] Although the plaintiff worked in the CEO building *before* COVID, his assertion that he would not have been able to practice social distancing in the CEO building is not supported by the record. He does not indicate that he ever worked in that building during COVID, so he does not know first-hand how crowded it was or whether people were able to socially distance. Tait testified that it was "normal from what he's experienced" during busy seasons, but not "crazy by any means." (Tait Dep. 23.)

[10] Tait testified, to the contrary, that, when Scaff voiced concerns to him about working in the CEO building, Tait told him to "go talk to HR." (Tait Dep. 37.)

explained that he could not "due to doctor restrictions." (*Id.*) He also explained that he had given notice to Tait about his restrictions, and Tait had "said it was okay." (*Id.*) Williams-Whitfield asked what his restriction was. When he told her, she responded that he "did not qualify." (*Id.* at 133.) He also told her he "had doctor's notes" and could "get another doctor note explaining the situation." (*Id.*) She allegedly told him that "it doesn't apply because it doesn't involve your disability." (*Id.*) He told her again that he needed social distancing, because his blood sugar was still not under control and he was at high risk from COVID-19. (*Id.*) She reiterated that this did not "apply to his disability." (*Id.*) At this point, according to the plaintiff, they were at an "impasse." (*Id.* at 134.) He testified that, because his supervisor Paul Connor was on vacation and they could not get in touch with him until Monday, and because the plaintiff would not agree to come work the shift at the CEO building that he was scheduled to work that weekend, Williams-Whitfield told him he was terminated. (*Id.* at 136.)

Scaff did not provide any documentation to Aetna stating that he could not work in the CEO building or could not work unless he was able to maintain social distancing. (*See* Scaff Dep. 97.) He maintains that his medical practitioner "made notes for" him, but, when he tried to turn them in to Gap, management told him that, "[a]s long as [his] FMLA [leave] is approved," he did not need notes. (*Id.*) He testified that he got a "note" from Gunselman dated March 17, 2020, apparently referring to the FMLA medical certification form. (*Id.* at 96–97, 98; *see also* Doc. No. 29-3.) He claims that, after that, he got "a bunch of notes," but every time he talked to Gap management, he was told he did not need to turn them it. (Scaff Dep. 97.) Gunselman purportedly gave Scaff one of the notes right before he went back to work in June 2020: "And I explained to her, can I go back to work? Is there any other restrictions do I have? And then that's when I got a

note about . . . social distancing." (*Id.* at 98.)[11] But when Gap management told him they did not need the notes, he threw them away. (*Id.* at 100, 101, 108, 137.) Scaff got two additional notes from his medical provider's office, dated December 23, 2020, after he had already been terminated. (*Id.* at 99–101.)[12]

Lash testified that she had one conversation with Scaff about his being assigned to work weekend shifts at the CEO. She recalled: "He came in and said that he – I don't recall if he said he couldn't or didn't want to go work in the CEO building. And he said he had diabetes. And I told him to bring in something from his doctor for us to look at." (Lash Dep. 21.)[13] There is no dispute that Gap's records do not contain any documentation of the plaintiff's medical need to maintain social distancing.

---

[11] The court presumes that Gunselman produced the plaintiff's medical record in discovery in this case, but no part of it has been introduced into evidence. It is therefore entirely unclear—and neither party raises this point—whether the plaintiff's medical record substantiates his assertion that Gunselman conditioned his return to work on his ability to maintain social distancing.

[12] To the court's knowledge, neither party introduced the notes from December 2020 into the record, though they were apparently made Exhibits 9 and 10 to Scaff's deposition, as well as exhibits to Gunselman's deposition. The parties filed with the court a "Telephone Encounter" note from Gunselman's office, documenting a telephone call from the plaintiff on December 23, 2020, requesting a "note saying from 4/10 to 6/13 he could not work because he needed to be social distancing due to chronic medical conditions" and a "second note saying from 6/15 he could work and can continue to work as long as he is social distancing. Scan them into his chart. Will pick up Monday . . . ." (Doc. No. 29-11.)

[13] Lash testified that, to her knowledge, Gap did not receive any medical notes from Scaff, aside from his FMLA certification. (Lash Dep. 16.) The plaintiff makes much of Lash's statement that, if Scaff had presented an "excuse note" from a doctor, the note probably would not have been accepted at all. (*Id.*) Lash distinguished, however, between a medical certification of disability ("MCOD"), doctor's note with a restriction, and a "doctor's note to excuse time off." (*Id.* at 15.) She made it clear that MCODs and medical notes regarding restrictions would be placed in an employee's medical file (*id.* at 15–16), but Gap typically would not accept doctor's excuse notes, in light of the no-fault absence policy (*see id.* at 17 (explaining that the "no-fault attendance policy" meant that "we don't necessarily take doctor's notes to excuse days. That for whatever reason you're not there, it is held against you – like, you receive an emergency day because we give you so many. So if you're sick or your child's sick or whatever, it would still be an emergency day."))

Williams-Whitfield testified that she had a conversation with Scaff when he was "at the point of term[ination] based off of his emergency days." (Williams-Whitfield Dep. 29.) She met with him and three other associates on the same day to say "hey, want to take a look at your ER days. You have maxed out your days. Are there any additional days on here that maybe something was going on that I can speak with your manager to see if we can give you credit . . . to lessen your days." (*Id.*) Scaff, according to Williams-Whitfield, said "no," because he did not want his manager, Paul Connor, to "do him any favors." (*Id.* at 30.) Williams-Whitfield said that this was not a question of favors but something they typically did, but Scaff said to her, "no, I'm good." (*Id.*) She confirmed that he understood that this meant he was "okay with [her] ending [his] assignment effective today due to the attendance policy," and he responded "yes." (*Id.*) She stated that he "did not even look at" the attendance sheet, which she had placed in front of him. (*Id.* at 32.)[14] Williams-Whitfield testified that she had gone into this conversation with the assumption that "some of his days would be taken care of," and she did not expect him to be terminated on that day. (*Id.* at 91–92; *see also id.* at 101 ("[H]e ultimately told me that I could move forward with his termination. . . . [I]t shocked me. I've never had anybody just flat out say, nope, I don't want your help.").)

The plaintiff's medical provider testified that she had a discussion with Scaff in December 2020 about his being "high risk for COVID, based on his diabetes" and his "need to be out of work . . . because of social distancing, because he didn't need to get COVID." (Doc. No. 35-6,

---

[14] Although neither Williams-Whitfield nor Scaff remembers Tait's being at the meeting (Williams-Whitfield Dep. 31; Scaff Dep. 136), Tait remembers being at the meeting, and his recollection of the conversation between Williams-Whitfield and Scaff is consistent with Williams-Whitfield's (Tait Dep. 31–33). Tait also stated that he believed that Scaff quit rather than being terminated, since he declined to have any conversation with Williams-Whitfield about adjusting his occurrence calculation. (*Id.* at 32–34.)

Gunselman Dep. 22.) Gunselman stated that Scaff did not explain to her why he needed a note "excusing him from work six months prior." (*Id.* at 23.) Rather, he told her "that his work was not practicing social distancing. And because he was at risk, he did not go." (*Id.*) She provided him with one note, dated December 23, 2020; her supervising physician, Dr. Guha, provided a second note, also dated December 23, 2020, stating that Scaff could "return to work as of 6/15, as long as he can socially distance." (*Id.* at 25.) To Gunselman's knowledge, neither she nor Dr. Guha provided Scaff "any other notes related to his employment at the Gap," aside from the FMLA certification in March 2020. (*Id.*) She also agreed that, if she had provided notes to Scaff "either related to the need for leave, accommodations, need for social distancing, whatever that might be, those would be reflected in his medical file." (*Id.* at 25–26.) She likewise agreed that she was required by law to make records of all services she provided a patient and that it was her practice, and her office's practice, to ensure that a copy of any note she provided to a patient would be included in his medical file. (*Id.* at 26–27.) She further agreed that, "at a minimum, if a copy is not included, certainly that would be noted in the visit records." (*Id.* at 27.) On questioning from the plaintiff's counsel, Gunselman conceded that it was "possible" that she or someone else in her office would have written a note for Scaff without making a copy of it, but she also reaffirmed that, "most of the time" such notes would be scanned into the chart even before they are given to the patient. (*Id.* at 28.)

### E.    Evidence of Disability and Retaliation

Williams-Whitfield testified that she was aware that Scaff had diabetes but may not have learned that fact until after his termination. (Williams-Whitfield Dep. 32–33.) At the time of his termination, Williams-Whitfield knew that Scaff had taken FMLA leave earlier in the year, that he was approved for intermittent FMLA leave, and that he had taken leave under Gap's open-leave policy from April through mid-June. Although she knew that he had been approved for intermittent

FMLA leave, she did not specifically ask him if any of his unexcused absences were FMLA related. (*Id.* at 34.) She testified that she was not aware that he had requested leave as an accommodation for a disability. (*Id.* at 46.) She did not recall learning that he claimed to be at high risk for COVID due to diabetes until after the lawsuit was filed. (*Id.* at 48.)

As set forth above, however, the record shows that Williams-Whitfield received notice in mid-April 2020 that Scaff had self-reported that he was "in a high risk group for covid19 due to his health" and had requested additional leave in connection with a medical condition that placed him at high risk, both under the FMLA and as an ADA accommodation. (*See* Doc. Nos. 34-12, 34-13, and 34-7, Yates Dep. 7.) Although these requests were denied, the plaintiff took leave from April through mid-June due to his concerns about COVID, and none of those absences was tallied as an occurrence.

There is no dispute that Williams-Whitfield never reviewed—and had no reason to review—the FMLA paperwork that the plaintiff submitted to the third-party administrator. It is also undisputed that Williams-Whitfield was the only individual involved in the decision to terminate Scaff's employment. (Whitfield Dep. 98.)

The plaintiff testified during his deposition that some of the absences on his Attendance Tally "probably" would qualify as FMLA intermittent leave under the approved request, but other than the dates from February 2020, he could not identify any that would have so qualified. (Scaff Dep. 142–43.) He does not contend that he pointed out any of those dates to Williams-Whitfield when she asked if any of his absences should be excused.

Scaff concedes that no one made negative comments about his purported disability and he was not treated more poorly than other associates because of his disability. (Scaff Dep. 145, 146–48.) He believes his discharge was the result of a miscommunication, but he also believes that

Gap's management-level employees should have had a better understanding of disability law and their responsibilities under the law. (*Id.* at 148, 159.)

For purposes of the defendant's motion, there is no dispute that diabetes is an endocrine disorder that affects a person's body systemically, potentially having adverse effects on nerves, kidneys, and eyes and decreasing the immune function, making those suffering from it more prone to illness or complications from illness.

As of March 2, 2020, Scaff's blood sugar was lower than it had been during his hospitalization but still outside optimal ranges. (Gunselman Dep. 18, 30.) Gunselman increased some of his medications at that point. (*Id.* at 18.), As of March 17, 2020, his blood sugar levels were better but still "a little bit elevated." (*Id.* at 17.) Scaff testified that he did not believe his diabetes was fully stabilized until two to three months after his termination from Gap. (Scaff Dep. 105.)

The plaintiff claims that he had a note from Gunselman stating that he needed longer breaks in order to check his blood sugar. (Scaff Dep. 108.) As discussed above, neither Gap's nor Gunselman's records substantiate that assertion. Scaff also claims that, prior to returning to work in June 2020, he tried to turn in a doctor's note requesting social distancing. (*Id.* at 98.) Again, his medical records do not substantiate that he requested, or that Gunselman provided, such a note. (Gunselman Dep. 25–27.)

Relying on Gap's EEOC position statement,[15] the plaintiff asserts that Gap's HR personnel knew that he was requesting social distancing at work. (Doc. No. 33, ASF ¶ 28.) Assuming the position statement qualifies as evidence, it shows only that the plaintiff requested social distancing,

---

[15] Gap states that its position statement is inadmissible in evidence. The court does not reach a conclusion regarding that assertion.

not that he supported it with a note from his doctor. Lash testified that, when Scaff told her he had diabetes and did not want to work in the CEO building, she directed him to "bring in something from his doctor for us to look at." (Lash Dep. 21.) Nothing in the record except the plaintiff's own testimony supports the plaintiff's assertion that he brought in a doctor's note confirming his need for social distancing.

The plaintiff asserts that the decision to terminate him occurred before his meeting with Williams-Whitfield. (ASF ¶ 45.) The defendant does not attempt to dispute this "fact" for purposes of the summary judgment motion (Doc. No. 39 ¶ 45), but the court notes that the plaintiff's citations to the record do not support it, nor does Williams-Whitfield's testimony (Williams-Whitfield Dep. 91).

The plaintiff filed suit on October 26, 2021, more than thirteen months after his termination. (Doc. No. 1.) He asserts claims of disability discrimination in violation of the ADA and the TDA (Counts I and III), retaliation in violation of the ADA and TDA (Counts II and IV), and claims under the FMLA for both interference with his rights under the FMLA and retaliation for engaging in activity protected by the FMLA (Count V). The defendant has now moved for summary judgment in its favor on each of these claims, supporting its Motion for Summary Judgment with a Memorandum of Law (Doc. No. 27), SUMF (Doc. No. 28), and a substantial quantity of evidentiary material. The plaintiff filed a Response in opposition (Doc. No. 32), combination Response to the SUMF and ASF (Doc. No. 33), and his own evidentiary material in support of his factual position. The defendant filed a Reply and a Response to the ASF. (Doc. Nos. 38, 39.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very

terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

III.    **ANALYSIS**

A.    **TDA Claims**

To start with the simplest issue, Gap asserts that it is entitled to summary judgment on the plaintiff's TDA claims on the basis that they are time-barred. (Doc. No. 27, at 13.) The plaintiff did not respond to this argument. (*See generally* Doc. No. 33.) The court finds that Gap is entitled to judgment as a matter of law on the TDA claims.

Claims under the TDA are subject to a one-year statute of limitations that is not tolled during the pendency of administrative charges. *See* Tenn. Code Ann. § 8-50-103(c)(2) (incorporating §§ 4-21-302 – 4-21-311); *accord Epley v. Walgreens Co.*, No. 1:18-CV-111, 2019 WL 5075829, at *4 (E.D. Tenn. Oct. 9, 2019) ("The Tennessee Disability Act (TDA) incorporates the one-year limitations period found in the [Tennessee Human Rights Act]." (citing Tenn. Code Ann. § 4-21-311(d) and *Jenkins v. Trane U.S., Inc.*, No. 3:12-cv-1280, 2013 WL 3272489, at *6 (M.D. Tenn. June 27, 2013)). The plaintiff was formally terminated effective September 27, 2020, and he clearly knew that he was terminated when the event occurred. His Complaint was filed more than one year later, on October 26, 2021. Accordingly, these claims are time-barred.

B.    **ADA Discrimination Claims**

Gap argues that (1) the plaintiff's claim under the ADA for failure to accommodate fails because, among other things, the plaintiff terminated the interactive process prematurely when he failed to provide any medical documentation to support his alleged accommodation request; and (2) the ADA discrimination claim fails because Scaff lacks evidence to show discriminatory intent or that the reason for his discharge was pretextual.

1.    *Failure to Accommodate*

The plaintiff claims that he has a disability as defined by the ADA and that the defendant failed to accommodate his disability in two ways: (1) by revoking previously given permission to

start his lunch break five minutes early, so that he could check his blood sugar and inject insulin in private; and (2) by failing to excuse him from working in the crowded CEO building in September 2020.

The ADA prohibits employers from "discriminat[ing] against qualified individuals on the basis of disability." 42 U.S.C. § 12112(a). ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination. An employer's refusal to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)). Such claims are analyzed under the direct evidence test. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020).

> Under this test, as applied to an alleged failure to accommodate:
>
> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer."

*Id.* (quoting *Kleiber*, 485 F.3d at 869). "When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is 'objectively reasonable.'" *Keith v. Cty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (quoting *Kleiber*, 485 F.3d at 870). "[R]equested accommodations are reasonable only if they 'address a key obstacle preventing [the employee] from performing a necessary function of [his job.]'" *Tchankpa*, 951 F.3d at 812 (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)).

Once the employee proposes a reasonable accommodation, the employee and employer "must engage in 'an informal, interactive process' to negotiate an accommodation that allows the disabled employee to work despite his limitations." *Id.* (citing 29 C.FR. § 1630.2(o)(3)). An employer is not required to accept without question a requested accommodation but may require the employee to provide medical documentation supporting it. *Id.* An employee who fails to provide the requested medical documentation cannot show that he participated in the interactive process in good faith or claim that the defendant failed to accommodate his request. *See id.* at 813; *accord Harvey v. Am.'s Collectibles Network, Inc.*, No. 3:09-CV-523, 2011 WL 182864, at *8 (E.D. Tenn. Jan. 20, 2011) ("Defendant requested substantiating medical information, and plaintiff did not provide it. By not providing the requested information, plaintiff did not participate in the interactive process in good faith, and thus impeded that interactive process. She, therefore, cannot claim that defendant failed to accommodate her under the ADA.").

As for the first element of the test, the plaintiff's diabetes clearly qualifies as a disability under the ADA. *Accord* 29 C.F.R. § 1630.2(j)(3)iii) ("[A]pplying the principles set forth [herein], it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . diabetes substantially limits endocrine function . . . ."). As set forth above, the defendant does not dispute that diabetes is an endocrine disorder that affects a person's body systemically and, among other things, potentially decreases the person's immune function.

The question here is whether the defendant made efforts to accommodate the plaintiff's proposed reasonable accommodations. With regard to the plaintiff's request for an accommodation in the form of being permitted to go on break five minutes early to check his blood sugar and administer insulin privately, there is no dispute that this request was made and initially honored.

The defendant claims that the permission granted to the plaintiff to take his break early was never revoked; the plaintiff claims that it was. This dispute is not material, however, because the plaintiff does not contend that he was unable to check his blood sugar and inject insulin while at work or that his ability to perform the essential functions of his job was affected by the alleged withdrawal of this accommodation. As set forth above, a requested accommodation is reasonable if it "'address[es] a key obstacle preventing [the employee] from performing a necessary function of [his job.]'" *Tchankpa*, 951 F.3d at 812 (quoting *Jakubowski*, 627 F.3d at 202). Because the plaintiff does not allege or attempt to show that his ability to perform the essential functions of his job was adversely affected by the purported withdrawal of this requested accommodation, his failure to accommodate claim based on this event fails. The defendant is entitled to summary judgment on this sub-claim.

The plaintiff also asserts that he requested an accommodation of his disability in the form of not being required to work in the crowded CEO building where, he believed, he would not be able to engage in social distancing as purportedly required by his medical condition. The plaintiff testified that no one from HR ever asked him for medical documentation to support this accommodation. (Scaff Dep. 70.) Moreover, as discussed above, he claims that he had documentation from his medical provider but was repeatedly told by management that they did not need it. Consequently, the plaintiff claims, he threw away the documentation. (*See* Scaff Dep. 97 ("I did have a bunch of notes [from Gunselman]. . . . [S]he made notes for me. And I'm like, do I need to turn these in? And Gap management said no. As long as your FMLA is approved, you don't need the notes. . . . I went to Gap management and HR. And they said, no, you don't need it."); *see id.* at 98, 100, 101.) Scaff also testified that, when he "reminded" Tait that he was medically restricted from working unless he could maintain social distancing because his "blood

sugar was still fluctuating," Tait told him "don't worry. You don't have to show up at all." (*Id.* at 122.)

Gap disputes all of that. Tait testified that, when the plaintiff told him he could not work in the CEO building, Tait told him to talk to HR. (Tait Dep. 37.) HR Generalist Angela Lash testified that she had one conversation with the plaintiff in which he told her that he "couldn't work" in the CEO building, because he had diabetes. (Lash Dep. 21.) Lash states that she instructed Scaff to provide medical documentation. (*Id.* at 21, 35.) Gap also denies receiving any medical documentation from the plaintiff to support his need for social distancing, and the only documents that the plaintiff has been able to produce are the March 17, 2020 FMLA certification and the December 23, 2020 letters provided by Gunselman and Guha. As set forth above, Gunselman testified that, to her knowledge, neither she nor Dr. Guha provided Scaff "any other notes related to his employment at the Gap," aside from the December 23, 2020 letters and the March 17, 2020 FMLA certification. (Gunselman Dep. 25.) Scaff's medical record as maintained by Gunselman's practice contains no other notes or any indication that Scaff requested notes. Gunselman agreed that she was required by law to maintain such notes in the medical record and that, if she had provided notes to Scaff related to a need for social distancing or any type of requested accommodations, copies should be in his medical record. (*Id.* at 25–26.)

Based on this evidence, the defendant maintains that the plaintiff cannot create a material factual dispute as to whether he presented, or tried to present, medical documentation of his need for social distancing, given that his medical practitioner's testimony and the absence of any evidence in his medical file contradict it. The cases on which the defendant relies, however, stand for the proposition that, where a witness's testimony is contradicted by *incontrovertible* evidence, such as a videotape or audiotape the accuracy and authenticity of which are undisputed, such that

no reasonable jury would find the witness credible, the witness's testimony does not "create a triable issue." *Shreve v. Franklin Cty.*, 743 F.3d 126, 132 (6th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The defendant is also correct that the absence of a record of a regularly conducted activity is both admissible into evidence, Fed. R. Evid. 803(7), and "probative of the fact that the event did not occur." *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) (quoting *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994)).

The absence of a record, however, is not the same as a videotape actually depicting an event. And while the absence of a record may be accepted as proof that an event did not occur, a witness's testimony may be accepted as proof that it did. To be sure, the court finds it highly unlikely that a jury would credit the plaintiff's testimony that he attempted to provide to Gap a doctor's note stating that he was medically required to work in an environment in which he could be socially distanced from others, in light of the countervailing evidence. Highly unlikely, however, does not mean impossible, and it is at least possible that a rational jury could credit the plaintiff's testimony and return a verdict in his favor. *Peeples*, 891 F.3d at 630. Moreover, even if the plaintiff failed to provide medical documentation of his need for an accommodation, there is a material factual dispute as to whether Gap actually required him to provide documentation, as the plaintiff claims that Tait approved his request not to work in the CEO building without requesting documentation.

Accordingly, insofar as the defendant moves for summary judgment on the plaintiff's ADA discrimination failure to accommodate claim based on the premise that the plaintiff never submitted medical documentation to support his requested accommodation not to work in the CEO building, a "genuine dispute" as to a "material fact" precludes judgment as a matter of law on that sub-claim. Fed. R. Civ. P. 56(a).

### 2. Termination

The plaintiff also asserts that he was terminated because of his disability, in violation of the ADA. (Doc. No. 1 ¶ 43.) The plaintiff's discrimination claim, unlike his failure to accommodate claim, is supported by indirect evidence and is evaluated under the familiar *McDonnell Douglas* burden-shifting framework.

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by establishing that (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) Gap knew or had reason to know of Scaff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (citations omitted).[16] Once the plaintiff makes out a *prima facie* case, "the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.* (citations omitted).

Gap argues that the plaintiff cannot show that Williams-Whitfield, the actual decisionmaker, had knowledge of Scaff's diabetes prior to his termination. "A *prima facie* case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (citing *Arthur v. Am. Showa, Inc.*, 625

---

[16] In *Whitfield*, the court expressly reaffirmed that the five-factor test established by *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)), applies in ADA cases, rather than a three-factor test used in *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002), and cases following *Mahon. See Whitfield*, 639 F.3d at 259 ("*Monette* states the proper test. . . . [I]t appears as though the *Mahon* court misread *Monette*. Because conflicts between published cases are resolved in favor of the earlier case, we adopt *Monette*'s five-element test for a *prima facie* case of employment discrimination under the ADA.").

F. App'x 704, 708 (6th Cir. 2015)). The evidence here shows that Williams-Whitfield received notice in April 2020 that Scaff claimed to be at high risk for COVID-19 due to a medical condition and that he had submitted a request for leave under the ADA as an accommodation for a disability to Aetna, the third-party administrator. (*See* Doc. Nos. 34-12, 34-13.) She also knew that Scaff was out on some type of medical leave during the spring of 2020. (Doc. No. 34-18.) While none of the communications concerning the plaintiff's request for leave around that time identifies his disability as diabetes, the court finds that the documentation in the record gives rise to a reasonable inference that Williams-Whitfield knew that the plaintiff was claiming a disability of some kind and was at least on notice as of his meeting with her on the day of his termination that he had diabetes and was at increased risk for COVID. Accordingly, there is a factual dispute as to whether Williams-Whitfield, as the decisionmaker, knew or had reason to know that the plaintiff was disabled by the time she made the decision to terminate him, for purposes of his *prima facie* case.

While the defendant claims that the plaintiff cannot show that he was treated differently from similarly situated non-disabled employees who were terminated in 2020 for accruing too many occurrences, Gap has not shown that Scaff's position was never filled or that he was not replaced. For purposes of the ADA discrimination claim based on Scaff's termination, the court has to assume that a reasonable jury might find, as discussed above, that the plaintiff requested an accommodation for his disability and that at least some of his unexcused absences should not have been recorded in the first place. Alternatively, even if the jury rejects the plaintiff's failure to accommodate claim, it might find that Williams-Whitfield, knowing that the plaintiff was suffering from a disability, had an obligation to inquire more closely into the reason for the plaintiff's recent absences. The court finds, in short, that the evidence viewed in the light most favorable to the plaintiff, for purposes of the defendant's Motion for Summary Judgment, is sufficient to establish

each element of the plaintiff's *prima facie* case.

The defendant contends that it reasonably terminated the plaintiff based on his absenteeism, under its generally applicable Attendance Policy, after giving the plaintiff an opportunity to examine the record of his absences to see if any of them should retroactively be excused—an opportunity he declined to take. Scaff, however, disputes Williams-Whitfield's version of the meeting during which he was terminated. According to Scaff, when he sat down with Williams-Whitfield, the first thing she asked was whether any of his absences would have been covered by his FMLA leave, and he responded that he did not know, because he did not remember the "exact days [he] was out." (Scaff Dep. 132.) When she asked why he had not reported for the overtime weekend shifts at the CEO building, he told her that he could not work at the CEO building because of doctor restrictions and that he had notified Jeff Tait, who told him "it was okay." (*Id.*) Williams-Whitfield allegedly asked Scaff what his restriction was, and when he told her, she replied that he "did not qualify." (*Id.* at 133.) He allegedly offered to get another doctor's note, but she repeated that "it doesn't apply because it doesn't involve your disability." (*Id.*) He reiterated that he was "high risk" and that his "blood sugar [was] still fluctuating," but Williams-Whitfield reiterated that "It does not apply to your disability, so it's denied." (*Id.*) He asked if there was "anything we can do," but she allegedly claimed she would not be able to talk to his supervisor until the following week, so he would have to be willing to work in the CEO building for his upcoming overtime shift. (*Id.*) The plaintiff refused to do this, based on his "disability and [his] health concerns." (*Id.*) He allegedly offered to "meet [her] halfway" by working overtime at the SDC building, but Williams-Whitfield rejected that offer and told him that if he refused to report to the CEO over the weekend, then "[i]t's termination." (*Id.* at 134, 135.)

The plaintiff's version of events strains credulity, to say the least, but it is sufficient to defeat summary judgment on the question of whether he was terminated because of his disability. That is, the defendant argues that terminating him for exceeding the acceptable number of occurrences was not pretextual, but it admits that the policy was somewhat flexible. The plaintiff's version of events suggests that he presented a basis for flexibility, which Williams-Whitfield rejected. If the jury believes the plaintiff, it could find that the proffered reason for the plaintiff's termination was pretext for discrimination. The defendant is not entitled to summary judgment on this sub-claim.

### C. FMLA Discrimination Claim

The plaintiff also claims that Gap interfered with protected FMLA leave and retaliated against him for taking FMLA leave. The defendant moves for summary judgment on these claims as well.

Congress enacted the FMLA "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1)–(5). The FMLA confers on eligible employees two interrelated rights: (1) "the right to use a certain amount of leave for protected reasons," and (2) "the right to return to an equivalent job after using protected leave." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 865 (6th Cir. 2023) (alterations and citations omitted).

#### 1. FMLA Interference

The plaintiff's FMLA interference claim, as set forth in the Complaint, is premised on allegations that the defendant did not alert the plaintiff to his rights under the FMLA and terminated him when he was eligible for FMLA leave. (Doc. No. 1 ¶ 74.)

To prevail on an interference claim, Scaff must prove that (1) he was an eligible employee under the statute, 29 U.S.C. § 2611(2); (2) Gap qualifies as an "employer" as defined under the FMLA, *id.* § 2611(4); (3) he was entitled to leave under the FMLA; (4) he gave Gap notice of his intention to take leave, and (5) Gap denied him FMLA benefits to which he was entitled. *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

Gap argues that the plaintiff cannot establish that he ever requested leave under the FMLA following his hospitalization in February 2020 to cover any of his unexcused absences following his return to work in June 2020. It contends that it granted Scaff all of the FMLA leave he requested and that he never requested any leave under the approved request for leave to attend medical appointments or to deal with "flare-ups" of his diabetes. The plaintiff does not dispute this argument and, indeed, has made no effort to retroactively attribute any of his unexcused absences from June through August 2020 to a medical condition that would be covered by the FMLA.

Gap also maintains that Scaff cannot base an FMLA interference claim on absences related to his claimed need for social distancing, because he never notified Gap that he needed leave to avoid work assignments that prevented him from maintaining social distance and never provided documentation to expand his intermittent FMLA leave to excuse him from reporting to work at the CEO building. As set forth above, however, there remains a question of fact as to whether Scaff provided a note from his doctor explaining that he needed, for medical reasons, to maintain social distancing at work.[17] Again, the plaintiff's evidence is exceedingly weak, but it remains possible for a jury to believe him and to conclude (1) that his direct manager did not require him to submit medical documentation to support his requested leave and/or (2) that Gunselman

---

[17] The defendant apparently accepts—but only for purposes of its Motion for Summary Judgment—the plaintiff's assertion that he would not have been able to maintain social distancing in the CEO building.

provided documentation but simply does not recall doing so and failed to make a notation of it in his medical chart.

Scaff also claims that Tait knew that he had requested not to work overtime in the CEO building for medical reasons and excused him from showing up on the days that he was scheduled to work in the CEO building. The plaintiff alleges that he explained all of this to Williams-Whitfield on the day he was terminated—that he had not reported to work on the weekends due to "doctor restrictions" and that his manager had "said it was okay." (Scaff Dep. 132.) This information arguably put Williams-Whitfield on notice that the plaintiff was requesting leave for a medically qualifying reason,[18] purportedly supported by medical documentation and approved by the plaintiff's manager.

The FMLA does not require an employee to "expressly assert his right to take leave as a right under the FMLA" in order to trigger its protections. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Rather, the employee must simply "provide enough information for the employer to know that the leave [he] has requested reasonably might fall under the FMLA." *Milman*, 58 F. 4th at 872. "[I]f an employer lacks sufficient information about an employee's reason for taking leave, it should inquire further to ascertain whether the employee's leave was potentially FMLA-qualifying." *Id.* (citation omitted). As the Sixth Circuit explained:

> The implementing regulation makes this clear: "In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying." 29 C.F.R. § 825.301(a). Once an employer is put on notice that an employee seeks to use her FMLA leave, moreover, the employer bears the obligation to collect any additional information necessary to make the leave comply with the requirements of the FMLA.

---

[18] The defendant makes no attempt to argue that an increased risk of dying from COVID due to uncontrolled diabetes was not a medically qualifying reason.

*Id.* (some internal quotation marks and second citation omitted).

Viewing the disputed facts in the light most favorable to the plaintiff and drawing all possible inferences in his favor, the court finds that the defendant is not entitled to summary judgment on the plaintiff's FMLA interference claim, insofar as it is premised on the plaintiff's termination, because Williams-Whitfield was arguably on notice that the plaintiff's two absences in September were "potentially FMLA-qualifying." *Id.* If the jury believes the plaintiff's version of events, it may conclude that Gap interfered with Scaff's FMLA rights by terminating him for excessive unexcused absences, despite Gap's policy providing that leave under the FMLA should not be tallied as an occurrence.

### D.     Retaliation Claims under the ADA and FMLA

The plaintiff also contends, in the alternative to his discrimination claims, that his termination was in retaliation for engaging in activity protected by the ADA and/or the FMLA. The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The FMLA likewise provides a cause of action for retaliation for engaging in protected conduct. *Milman*, 58 F.4th at 866 (recognizing that a retaliation claim arises under the FMLA "when an employer takes an adverse employment action against the employee for exercising or attempting to exercise a right protected by the FMLA").

In the absence of direct evidence of retaliation, these claims, too, are analyzed under the *McDonnell Douglas* framework. Under this framework, the plaintiff bears the initial burden to establish a *prima facie* case of retaliation by showing that (1) he engaged in activity protected under the ADA and/or FMLA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected

activity and the adverse action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)); *Milman*, 58 F.4th at 867 (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)). For either claim, "[e]stablishing a *prima facie* case of retaliation is a 'low hurdle.'" *Rorrer*, 743 F.3d at 1046 (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001)).

There is no dispute that the plaintiff engaged in activity protected by the FMLA when he took leave in February 2020 and that his acts of requesting additional leave under the FMLA and under the ADA in April 2020 were protected under the respective statutory schemes. His requests for accommodations in the form of being permitted to maintain social distancing and, more specifically, not being required to work in the CEO building, were arguably protected under both the FMLA and the ADA. The defendant does not argue to the contrary.

Regarding the retaliation claims premised upon the plaintiff's taking leave in February and requests for leave in April, the defendant argues that Williams-Whitfield had no knowledge that the plaintiff had requested an accommodation for a disability or that he had diabetes. (*See* Williams-Whitfield Dep. 32, 40–41, 46, 95.) Rather, she testified that she knew only that Scaff had taken "short-term disability" leave, presumably referring to his FMLA leave (*see id.* at 43–44, 49) and that he had taken advantage of the company's open-leave policy under COVID (*id.* at 44–45). As noted, however, the record shows that Williams-Whitfield received notice that Scaff requested leave as an accommodation under the ADA and that he had requested additional leave under the FMLA in April 2020. (Doc. Nos. 34-12, 34-13.)

As the defendant points out, however, there is no evidence of a causal connection between Scaff's engaging in protected activity in the spring of 2020 and his termination. At the *prima facie* stage, a plaintiff's burden, again, is "minimal"—requiring only that he "put forth some evidence

to deduce a causal connection between the retaliatory action and the protected activity." *A.C.*, 711 F.3d at 699 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). Temporal proximity can "help meet this causal burden," but temporal proximity standing alone will be sufficient to create an inference of a causal connection only when the "adverse action comes 'very close in time' after the exercise of protected activity." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth Circuit has subsequently reaffirmed that "[t]emporal proximity alone generally is not sufficient to establish causation" and that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448–49 (6th Cir. 2020) (quoting *Mickey*, 516 F.3d at 525; other citations omitted). In *Kenney*, the plaintiff was fired two and one-half months after complaining about the employer's discriminatory hiring practices. The court held that "temporal proximity is one consideration in assessing whether [the plaintiff] has satisfied her burden to show causation between her complaint and her termination. But a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation." *Id.* at 449. Thus, the plaintiff was required to "provide other indicia to support a causal connection." *Id.*

In this case, nearly five months elapsed between Williams-Whitfield's receipt of notice that the plaintiff had requested medical leave and his termination. Although he failed to provide medical documentation to support the request, Gap nonetheless allowed Scaff to take more than two months of leave while Gap was adjusting to business in the time of a pandemic. Following his return to work, there is no evidence that Williams-Whitfield was made aware that the plaintiff engaged in any other activity protected by the ADA or the FMLA. The five months that elapsed between her notice of the protected activity in the spring of 2020 and the adverse action is not

sufficient, standing alone, to give rise to an inference of causation, and the plaintiff has not pointed to any other evidence of a causal connection.

The court finds, in short, that the plaintiff has not provided evidence of a causal connection between his protected activity in April 2020 and his termination. Because Scaff has failed to establish a *prima facie* case of ADA or FMLA retaliation as to that protected activity, Gap is entitled to summary judgment on these sub-claims.

The retaliation claims arising from Scaff's termination on the heels of his two absences in September 2020 present a closer call. The defendant argues about the absence of retaliatory intent on the part of Williams-Whitfield, but the whole point of the *prima facie* case is to obviate the plaintiff's need to prove intent. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) ("Under the *McDonnell Douglas* scheme, '[e]stablishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" (quoting *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The defendant also avoids discussing the temporal proximity between the adverse employment action and the protected activity.

Nonetheless, there is no evidence in the record that, at the time Williams-Whitfield determined that Scaff was eligible for termination and called him into her office to discuss his unexcused absences, she had actual knowledge that he had engaged in additional protected activity or that any of his absences were potentially FMLA-related or disability-related. Although the court has determined that, if a jury believes the plaintiff's version of events, he may prevail on his discrimination claims, there is not sufficient evidence in the record from which a reasonable jury could conclude that the plaintiff's termination was in retaliation for engaging in protected

activity.[19] Summary judgment, accordingly, is warranted on the retaliation claims under both the ADA and the FMLA.

## IV. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted in part and denied in part.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

---

[19] In any event, if the plaintiff did have a viable retaliation claim under either statutory scheme, it would be completely co-extensive with, and redundant of, the discrimination claims.